UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL A. CLARK-EL,                      )
                                          )
              Plaintiff,                   )
                                          )
      v.                                   )          No. 4:21-cv-01379-SRC
                                          )
MISSOURI DEPARTMENT                        )
OF CORRECTIONS, et al.,                    )
                                          )
              Defendants.                  )

### Memorandum and Order

This matter comes before the Court on review of plaintiff Michael A. Clark-El's amended

complaint pursuant to 28 U.S.C. § 1915A.  Based on that review, and for the reasons discussed

below, the Court dismisses the complaint with prejudice.

### Background

Plaintiff is a self-represented litigant who is currently incarcerated at the Jefferson City

Correctional Center in Jefferson City, Missouri.  On November 22, 2021, the Court received a

complaint brought under 42 U.S.C. § 1983 and 42 U.S.C. § 1985.  Doc. 1.  The complaint was

typewritten and thirty-three pages long, with an additional thirty-two pages of exhibits.  Plaintiff

named over eighty defendants from at least eight different prisons, with claims spanning thirty

years.  The complaint was not accompanied by a motion for leave to proceed in forma pauperis,

or the full filing fee.

On February 7, 2022, the Court directed plaintiff to either file a motion for leave to

proceed in forma pauperis or pay the entire filing fee.  Doc. 5.  He was given thirty days to

comply.  On March 8, 2022, the Court received plaintiff's civil filing fee.  The following day, he

submitted an amended complaint, Doc. 7, which became the operative pleading.  *See In re*

*Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) ("It is well-established that an amended complaint supercedes [sic] an original complaint and renders the original complaint without legal effect." (citation omitted)).

### The Amended Complaint

Plaintiff's amended complaint is brought pursuant to 42 U.S.C. § 1983.  Doc. 7.  It is on a Court-provided form, but most of the allegations are contained within a typewritten complaint that is attached to the form complaint.  The attachment is similar to his original complaint, and nearly identical to a previously filed complaint in state court.  The amended complaint is forty-three pages long, and encompasses allegations spanning thirty years at nine correctional institutions: (1) Missouri Eastern Correctional Center (MECC); (2) Crossroads Correctional Center (CRCC); (3) Old Jefferson City Correctional Center (Old JCCC); (4) Potosi Correctional Center (PCC); (5) South Central Correctional Center (SCCC); (6) Farmington Correctional Center (FCC); (7) Eastern Reception, Diagnostic and Correctional Center (ERDCC); (8) New Jefferson City Correctional Center (New JCCC); and (9) Moberly Correctional Center (MCC).

In the amended complaint, plaintiff names a total of eighty-six defendants:[1] (1) Correctional Officer Kevin Lawton, at the MECC; (2) the Missouri Department of Corrections (MODOC); (3) Functional Unit Manager (FUM) Staci Smith, at the CRCC; (4) Terri Paige, Assistant Warden at CRCC; (5) Anne Precythe, Director of MODOC; (6) COI Cavanaugh, at the Old JCCC; (7) COI Kemna, at the Old JCCC; (8) Steve Long, Assistant Director of MODOC; (9) Don Roper, Superintendent of the PCC; (10) Michael Groose, Superintendent of the Old JCCC; (11) Gerald Bommel, Assistant Superintendent of the Old JCCC; (12) Gene Stubblefield, Superintendent of the MECC; (13) Michael Bowersox, Superintendent of the SCCC; (14) James

---

[1] Defendants Precythe and Dormire are listed twice. Other defendants, such as Crocker and Theime, are listed multiple times, but these appear to be references to different defendants with the same last name.

Purkett, Superintendent of the FCC and ERDCC; (15) Kate Klein, at PCC; (16) Kim Klein, at PCC; (17) Princess Fahnestock, Correctional Caseworker (CCW) at SCCC; (18) Sergeant Warren, at PCC; (19) COI Warren, at PCC; (20) Sergeant Frank Sancegraw, at PCC; (21) COI Richards, at PCC; (22) Correctional Classification Assistant (CCA) Richards, at PCC; (23) Sergeant Danny Browers, at Old JCCC; (24) Baretta Browers, at PCC; (25) John Harper, at PCC; (26) Jeff Harper, at PCC; (27) COI Dicus, at PCC; (28) Gary Kempker, Director of MODOC; (29) Dewayne Kempker, Superintendent at the Old JCCC; (30) Ronald Hamby, at SCCC; (31) Jason Arthur, at SCCC; (32) Sergeant Hale, at SCCC; (33) Captain Fred Arflack, at MECC; (34) Melody Haney, at PCC; (35) CCA Short, at PCC; (36) COI John F. Gilliam, at Old JCCC; (37) CCA Richard White, at ERDCC; (38) COI Tim Pickett, at PCC; (39) Brenda Secoy, at ERDCC; (40) Stan Payne, at ERDCC; (41) Terry Crocker, at ERDCC; (42) COI Crocker #1, at PCC; (43) COI Crocker #2, at PCC; (44) Susan Jackson, at MECC; (45) COI Jackson, at MECC; (46) Pat Mantle, at Old JCCC; (47) Danetta Henderson, at ERDCC; (48) Dave Dormire, Superintendent at the Old JCCC; (49) Loretta Moss, at ERDCC; (50) FUM Daniels, at MECC; (51) COI Wiseman, at MECC; (52) Sharon Sansouchie, at PCC; (53) Mary McGinley, at CRCC; (54) Linda Carr, at CRCC; (55) Robert Baker, Central Transfer Supervisor; (56) Theresa Thornburg, Superintendent of the Moberly Correctional Center (MCC); (57) Brian Allen, at PCC; (58) Charlie James, at ERDCC; (59) Karen Stuchell, at ERDCC; (60) COI Best, at CRCC; (61) COI Kelley, at CRCC; (62) Kimberly Ross, at CRCC; (63) Wilem Wykert, at CRCC; (64) Tanya Young, at CRCC; (65) Michael Weber, at CRCC; (66) George Lombardi, Director of MODOC; (67) Jeffrey Taul, at CRCC; (68) COI Theime #1, at CRCC; (69) COI Theime #2, at CRCC; (70) COI Jundy, at CRCC; (71) COI Benton, at CRCC; (72) COI Moss, at CRCC; (73) COI Butler, at CRCC; (74) Sergeant Cox, at CRCC; (75) Warden Eileen Ramey, at the New JCCC; (76)

Assistant Warden Raina Martin, at the New JCCC; (77) COI Isaac Quainoo, at New JCCC; (78) COI Joyce Bales, at New JCCC; (79) Parole Officer Donna Welke; (80) Board of Probation and Parole Chairman Cranston Mitchell; (81) Food Service Manager Lillie Moore, at CRCC; (82) COI Shamarra Etzler, at CRCC; (83) COI Alan Woodcock, at CRCC; (84) FUM Benjamin Brooke, at CRCC; (85) COI Julius Sanni, at New JCCC; and (86) COI Lamb, at New JCCC. Doc. 7 at pp. 7–13.  Clark-El sues the individual defendants in both their official and individual capacities.

The "Statement of the Facts" section in plaintiff's amended complaint runs for twenty pages.  Confusingly, he presents his claims out of chronological order, jumping back and forth between different years and different penal institutions.  He also mentions "defendants" who are not properly identified as defendants in either the caption or the "Statement of the Parties" section of the amended complaint.  Rather than attempting to reorder plaintiff's facts into sequence, the Court will proceed through the allegations as plaintiff has presented them.

Plaintiff begins by accusing MODOC, through its "policies and customs," of violating his right to petition for grievances and right of access to the courts.  Doc. 7 at p. 13.  In particular, he alleges that on June 13, 1990, defendant Lawton took his Missouri Supreme Court Rule 29.15 postconviction motion during a "shakedown exercise at MECC."  When plaintiff asked for its return, defendant Arflack sprayed him with mace.  The draft motion was not returned, and plaintiff states that he missed the filing deadline, leading to a procedural bar that has kept him "stranded in a constitutional [and] statutory no man[']s land."

Plaintiff next states that MODOC failed to provide him any postconviction remedy.  Doc. 7 at p. 14.  Specifically, he claims that he was transferred to the Old JCCC, and that he needed a typewriter because his hand was deformed.  However, plaintiff asserts that in 1990, there was no

typewriter in the law library, that the "library stayed closed most of the time," that there were only three typewriters for two thousand inmates, and that two of the typewriters did not have ribbons.  He claims that this kept him from timely filing his Rule 29.15 motion.

Between August 14, 1990, and September 5, 1990, plaintiff alleges that defendants COI Cavanaugh and COI Kemna harassed him, used racial slurs, and took his passes to go to the law library, adding to his inability to timely file for postconviction relief.  Doc. 7 at p. 15.

In 1992, while at the Old JCCC, plaintiff received a "false conduct violation report" for dangerous contraband found in the chapel.  He alleges that it was issued by defendant Mantle, a prison investigator, on the order of Superintendent Groose.  Based on this violation, plaintiff was placed into "super max," where he was unable to work on a federal court case he had filed.  The case was "kicked out" for a "failure to litigate," at which point plaintiff was released and the conduct violation removed.

On February 27, 1998, while in the MECC, plaintiff states that defendant Susan Jackson placed him in administrative segregation "for dangerous contraband."  Doc. 7 at p. 16. Thereafter, he claims he was left in "lockdown" for ninety days without an investigation being conducted, even though an investigation is only supposed to last thirty days.  Plaintiff asserts that the investigation was a "sham," and that Superintendent Stubblefield, FUM Daniels, and Director Long failed to provide him with any review, or allow him to access grievances or legal materials.  Further, plaintiff alleges that these defendants issued him a false conduct violation, which COI Wiseman refused to write, "because it never happened."  Plaintiff alleges FUM Daniels "violated" his "due process rights" by denying him a fair and impartial fact finder, and by "finding him guilty based on [an] officer[']s statement," which plaintiff insists constitutes a finding of guilt "without any evidence."

Between February 1998 and May 1998, plaintiff states that "the defendants," including MODOC, forced him into a one-man cell with three inmates. Doc. 7 at p. 17. He states that he slept on the floor next to "the filthy toilet, with roaches, rats, and spiders [crawling] all over him." Plaintiff contends that "defendants" (not identifying any defendant by name) refused to move him, despite his requests.

On October 18, 2003, while at the PCC, plaintiff was issued a "false conduct report" by COI Pickett for "interfering with the count." He denies engaging in "any of these types of childish games," and asserts that it was related to his filing of a grievance against Kim Klein. At plaintiff's disciplinary hearing, Kim Klein was his hearing officer, and failed to recuse herself. In addition, Kim Klein heard the violation beyond the seven-day limit, found him guilty without any evidence other than an officer's statement, and "refused to allow him to submit documentary evidence." Plaintiff further contends that Kim Klein "disappeared" his enemies list from the computer, meaning that he was "fed his meals by those named enemies," resulting in "diseased and unfit food for human consumption." Plaintiff alleges that this led to eight "months of starvation, weight loss, and torture."

On November 20, 2014, while at the CRCC, plaintiff states that he was issued a conduct violation that "was not heard until" December 4, 2014, beyond the seven-day limit. Doc. 7 at p. 18. He insists that hearing officer Staci Smith had "no justification for proceeding beyond the 7 day statute of limitations," and therefore violated his right to due process. Plaintiff also contends that he was found guilty "without any evidence" other than the officer's statement and the written report.

Additionally, plaintiff asserts that Staci Smith retaliated against him by feeding him "diseased and unfit food." He states that "he ate so much twisted[,] tainted food that he suffered

nutritional deficiency, weight loss, involuntary drug consumption, sleep deprivation, and other forms of torture." By way of example, plaintiff claims that on February 29, 2015, "he took a large bite from a piece of cake" and almost "swallowed a fish hook." He also asserts that Assistant Superintendent Terry Paige "failed to redress these constitutional violations." The Court notes that plaintiff does not present a single fact establishing that Staci Smith placed a fishhook in his cake or otherwise did anything to his food.

Between August 19, 2003 and August 4, 2005, while at the PCC, plaintiff states that Sergeant Frank Sancegraw, COI Warren, and Sergeant Warren "targeted and destroyed his legal materials and personal property while he was in" administrative segregation. Doc. 7 at p. 19. In particular, they allegedly took his typewriter from the property room, broke his Walkman radio and beard trimmer, and threw away "his legal books." When plaintiff got out of administrative segregation on November 9, 2004, he states that property room staff began approaching him, "trying to blame each other." Further, he asserts that his grievances "began to disappear," and "continued to vanish even after his transfer" to the ERDCC. Plaintiff attributes this to a "campaign of harassment and tricks" by Caseworker Secoy and Stan Payne.

While still at the PCC, plaintiff asserts that defendant Sancegraw created a dangerous condition by giving another inmate plaintiff's property, and then telling that inmate that plaintiff had "told on him." Later, defendants Brian Allen, Melody Haney, and Sergeant Warren "arranged for" both plaintiff and this other inmate "to be assigned to the same job." Without explanation, plaintiff states that on November 16, 2004, he "refused to play gladiator," and that Sergeant Warren "flew into a racial vent" and "assaulted him by slapping on the handcuffs so violently it broke the skin."

On June 10, 1994, when plaintiff was incarcerated at the Old JCCC, he states that Superintendent Groose, COI Gilliam, and Sergeant Browers all "targeted" his "legal work for the purpose of confiscation and distruction [sic] . . . ." Doc. 7 at p. 20. More specifically, he states that "his legal work was meticulously catalogued and taken," and that "he was issued a false conduct violation report for" having contraband. Plaintiff notes that he was found guilty, but objects because the contraband was "his own property."

On January 1, 2004, while in the administrative segregation unit of the PCC, plaintiff asserts that Baretta Browers issued him "a false conduct violation" for assaulting a staff member. Specifically, plaintiff was accused of striking Browers "with a milk carton," which he denies. He states that this major conduct violation "was used to justify placing plaintiff on death row." At the hearing, plaintiff insists that the hearing officer had made a finding of guilt when he "walked up to the door," before it had begun. He claims that he was wrongfully found guilty, and states—by way of defense—that he does not drink milk, and thus could not have thrown a milk carton at Browers.

In December 1999, plaintiff was transferred from the Old JCCC to the PCC. Doc. 7 at p. 21. During this transfer, his "legal work was purposefully left at the prior institution," for which he blames CCA Short and Melody Haney, among others, because they refused to provide him with "meaningful" administrative segregation review.

Between 2001 and 2002, plaintiff states that he was "repeatedly transferred" between the MCC and the CRCC, an "abuse called marathon sessions." He asserts that Theresa Thornburg, Mike Kemna, and Robert Baker were responsible for his transfers.

Between August 2003 and August 2005, while at the PCC, plaintiff alleges that Sergeant Sancegraw "repeatedly refused to take [him] to the property room to inventory his legal materials

and try to update his current cases." Further, he states that Director Long, Melody Haney, and other staff were part of "the ongoing campaign of denial and harassment."

Throughout his period of incarceration, plaintiff states that MODOC staff has "repeatedly opened his legal mail" outside of his presence.  Doc. 7 at p. 22.  He provides a list of such incidents, stating that defendant Sharon Sansouchie opened his legal mail at the PCC on February 8, 2000, and May 12, 2000; that Loretta Moss opened his legal mail at the ERDCC on April 4, 2006; that Terry Crocker opened his legal mail at the ERDCC on October 16, 2006 and November 2, 2006; that COI Dicus opened his legal mail at the PCC on July 27, 2005; that CCA Dunn opened his legal mail at the PCC on July 28, 2004; that Michael Weber opened his legal mail at the CRCC on November 12, 2014; and that COI Sandridge[2] opened his legal mail at the CRCC on August 25, 2010.  Doc. 7 at pp. 22–23.

On September 24, 2020, while incarcerated at the New JCCC, plaintiff states that defendant Isaac Quainoo gave him his St. Louis American newspaper, which was dated August 27, 2020.  Doc. 7 at p. 23.  He states that this was "thirty days later," and suggests that Quainoo did this intentionally, vaguely asserting that Quainoo and Julius Sanni have been "giving his mail to the wrong inmates and harassing [him] for too many years now."  On August 25, 2020, plaintiff received a "new password" from J-Pay, but strenuously states that he does not have a J-Pay account, and "maybe never will."  Plaintiff apparently believes this occurred because "a few years back" his "vital information" was "compromised."  He asked Assistant Warden Raina Martin "to tell them to stop all this and leave him alone," but alleges that "she failed."  Plaintiff also notes that Warden Eileen Ramey and Director Anne Precythe did not seem to care about this

---

[2] Plaintiff refers to both CCA Dunn and COI Sandridge as defendants, but neither are properly identified as defendants in the caption or the section of the form complaint for naming the parties.

"wire fraud."  The Court notes that plaintiff has not presented any facts indicating a

"compromise" of his vital information or that fraud has occurred.

On December 28, 2005, while at the ERDCC, plaintiff states that he went to the property

room to pick up his legal mail where he "found that Richard White . . . had purposefully lost or

destroyed it."  Doc. 7 at p. 24.  He alleges that White "took steps to cover it up by" telling other

staff members, such as defendants "Secoy, Vance, Moss, Roper, etc., to make sure [his]

grievances would not get any traction."  As a result, plaintiff asserts that his grievances "were

always lost and Stan Payne the grievance officer kept sending them back."  On May 9, 2006,

defendant White "told him to his face that he had no legal materials in the property room," and

denied his grievance request.  Plaintiff claims that FUM Danetta Henderson and Stan Payne tried

to help White "cover his tracks."  However, on August 30, 2006, defendant James Purkett

"admitted that [plaintiff's] legal material was lost or destroyed by the staff and tried to credit his

inmate account with ten dollars."

In "early 2014 at the CRCC," plaintiff states that "property room staff COI Kelley and

COI Best gave his tennis shoes to another inmate as part of an ongoing campaign of racist

harassment."  Despite filing a grievance, "nothing was ever really done that rectified the

situation."  Later, on February 3, 2015, plaintiff asserts that Kelley and Best "lost or destroyed"

the legal materials he had in storage, claiming "it was eaten up and destroyed by rodents."  He

"repeated the grievance process," but "again nothing was ever really done to make [him] whole."

On June 7, 1994, while at the Old JCCC, plaintiff states that Superintendent Michael

Groose and Assistant Superintendent Gerald Bommel denied him a visit with his fiancé.  Doc. 7

at p. 25.  He filed a civil action, and "defendants placed her on [his] visitors list forthwith."

Thereafter, plaintiff dismissed his case.  However, in January 1995, he claims that "the

10

defendants retaliated by issuing a false conduct violation." Eventually, plaintiff "was found guilty based on the officer[']s statement without any evidence." He states that this was a reprisal for his civil action, and that it destroyed his relationship.

On April 15, 2015, while at the CRCC, plaintiff states that Wilem Wykert "targeted [his] broken hand and slammed on handcuffs, for no other reason but to cause him pain." He also states that Wykert gave him a false conduct violation for a minor assault.

On May 15, 1998, plaintiff made "an official request for final disposition of charges," but states that he was not tried or convicted for another twenty-six months. Doc. 7 at p. 26. He believes that MODOC is liable because they "should never have released plaintiff into the custody of the St. Louis County Sheriff transport officers because he was entitled to a dismissal of the charges by the Director of [MODOC]." He alleges this happened again when he requested final disposition of charges on August 24, 1999, but the charges were not disposed of until April 26, 2000, and also when he requested disposition of charges on June 28, 1989, but was not brought to trial until August 6, 1990.

Between June 2014 and September 2014, while at the CRCC, plaintiff states he was threatened with administrative segregation if he did not "sign an enemy waiver form" with his cellmate. Doc. 7 at p. 27. According to plaintiff, "he had no problem with his cellmate because he didn't know what was going on in his sleep or behind his back." However, unknown to plaintiff, his cellmate was allegedly "putting brown [recluse] spiders in his bed," "playing homosexual games with plaintiff in his sleep," putting "medications in his eyes[,] nose and mouth so he couldn't wake up," as well as attempting to induce a heart attack and sticking plaintiff's toes "with needles." On September 4, 2014, plaintiff got into a fight with his cellmate, resulting in a broken hand. Plaintiff claims that defendants Mary McGinley and Sergeant Cox

either "encouraged [the] fight between plaintiff and his cellmate" or "failed to protect" him from his cellmate.

On September 14, 2014, plaintiff states that he was being escorted to medical for his broken hand when COI Benton "slammed on the handcuffs to cause him pain" and "smashed his broken hand into the chuck hole for no reason."  On September 16, 2014, while returning from treatment for his broken hand, he claims that COI Jundy dropped "what he was doing and ran across the room and began pushing[,] pulling and twisting violently on the handcuffs[,] simply to cause him pain."  Meanwhile, he alleges "Mary McGinley and Staci Smith took turns teasing him" about his grievances, though he states "it could have been COI Butler."

On September 19, 2014, while at the CRCC, plaintiff states he filed a complaint against defendants Etzler and Woodcock for "sexual assault (verbal and physical)."  Doc. 7 at p. 28.  He explains that "as he was going to and from the shower, while in handcuffs and on his knees, they would take turns brushing up against his behind and making harassing statements trying to provoke him so they could have reason to create a major incident and use excessive force."

On December 4, 2014, on his way to a disciplinary hearing, plaintiff states that "COI Benton and COI Jundy took turns slamming on the handcuff[s]" and "violently" pushing, pulling, and twisting "them to simply cause pain."  At the hearing, plaintiff alleges that defendant Staci Smith "laughed herself teary eyed" and then "left the hearing to make a phone call."  He states that he got dizzy and lost consciousness, at which point a sergeant ordered his handcuffs to be loosened.

On January 14, 2015, plaintiff alleges that COI Taul "sexually assaulted [him] for a second time" by "brushing [Taul's] shoulder and entire length of his arm against plaintiff[']s behind."  Plaintiff next alleges that defendant Etzler "slammed on the handcuffs targeting his

broken hand to cause pain." He states this occurred "in reprisal" for filing a complaint against Etzler on September 19, 2014. On April 2, 2015, plaintiff states that COI Moss "retaliated against plaintiff" for an earlier complaint by "violently" slamming handcuffs onto him, causing his hand to smash into the chuckhole.

In June 2009, plaintiff asserts that COI Jones stuck "his crotch area in plaintiff[']s face while plaintiff was eating chow." He demanded to see COI Jones's supervisor, Lieutenant Jones. Lieutenant Jones told him to make a complaint, which "disappeared." Plaintiff notes that Lieutenant Jones was COI Jones's brother. The Court observes that plaintiff has not properly identified either COI Jones or Lieutenant Jones as defendants, nor has he established where this took place.

Between May 12, 2004 and July 2004, while at the PCC, plaintiff states that "he was being served his meals by his documented enemies in shifts." Doc. 7 at p. 29. These "enemies" had been assigned that job by staff members who allegedly included—among others—CCA Richards, COI Richards, Superintendent Roper, Assistant Director Long, COI Crocker #1, and COI Crocker #2. Plaintiff makes no effort to describe what each individual actually did or did not do, or why being served meals by his "enemies" resulted in "nutritional deficiency and weight loss."

On June 11, 2003, at the SCCC, plaintiff states that Sergeant Hale and COI Hamby opened his cell "while he was at chow," allowing "two or three racist inmates to go into his cell and steal his legal work." Plaintiff states that he "caught them in the act and ran them off," warning Hale and Hamby "that if they did it again he would file a civil action against him." In response, plaintiff received "a false" conduct violation "for threats," and was put "into the hole." Princess Fahnestock "found him guilty based on the officer[']s statement," which plaintiff insists

is "without evidence."  On July 2, 2003, Jason Arthur issued plaintiff "a false major" conduct violation for "organized disobedience."  As before, he was found guilty.  Plaintiff states that Superintendent Gary Kempker "tacitly approved of these multifaceted constitutional violations by rejecting his letters and denying his grievances."

Plaintiff generally accuses MODOC of violating the constitution by promulgating and implementing policies regarding "nepotism."  Doc. 7 at p. 30.  Specifically, he complains that there are "too many relatives within the first, second, and third sanguianity [sic]" who have "conspire[ed] against him, both on and off the job."  Plaintiff also broadly asserts that MODOC's "grievance policy is unconstitutional" and "no more than an exercise in futility."  With regard to MODOC policies regarding property rights, plaintiff asserts that the fifteen-day period to file complaints is unconstitutional, since it did not give him enough time to know something "was wrong with his property."  Doc. 7 at p. 31.

On April 24, 2018, at the New JCCC, plaintiff states that "defendant Joyce Bales refused to allow [him] into the property room to inspect/exchange his legal property."  Bales apparently claimed that plaintiff's name was not on the list, while plaintiff insists that he saw the list in her hand and that "his name and number were on it."  Plaintiff states that this "was the last straw and [he] filed [a] grievance," which did "no good."

Plaintiff claims that MODOC violated his constitutional rights when he was a pretrial detainee because he did not receive a "fast and speedy trial" and was not allowed to remain on parole, like his codefendant.  Doc. 7 at p. 32.  In particular, he alleges that on November 12, 1988, defendant Donna Welke placed a parole hold on him without probable cause after he was arrested, and that Cranston Mitchell revoked his parole on May 17, 1989.  Plaintiff contends the actions of Welke and Mitchell constituted punishment while he was "on pretrial detainee status."

On April 30, 2021, while at the New JCCC, plaintiff states that Julius Sanni "gave his mail to the wrong inmate on purpose," which plaintiff somehow knows because he "was looking right at defendant as it happen[ed]."  Then, on May 5, 2021, Sanni "gave plaintiff someone else[']s mail in an attempt to add insult to injury."  Plaintiff notes that he once "had a suspicious fire at a relative[']s address after this type of mail fraud."

Finally, on April 29, 2021, plaintiff states that he "mailed out this very complaint . . . to the Clerk of this Court."  Doc. 7 at p. 33.  Because it was too large to fit into the mail slot, plaintiff handed the complaint to COI Lamb.  According to plaintiff, COI Lamb made "sure that COI defendant Quainoo wound up with it and passed it out to the wrong inmate."

Based on these facts, plaintiff presents eight different causes of action.  Doc. 7 at pp. 34–35.  First, he alleges that he was denied his right to petition for grievances and to access the courts by defendants Lawton, Arflack, Kemna, Cavanaugh, MODOC, Mantle, Groose, Sancegraw, COI Warren, Sergeant Warren, Sergeant Browers, Gilliam, Sansouchie, White, Purkett, Bommel, Sandridge, Dicus, Weber, Kelley, Best, Moss, and Dunn.  Doc. 7 at p. 34.

Second, plaintiff alleges that MODOC violated his constitutional rights by releasing him into the custody of "county transportation officers where there was no jurisdiction."

Third, plaintiff claims he was not protected against retaliation for filing grievances and civil actions by defendants Groose, Bommel, Susan Jackson, Lawton, Arflack, Daniels, Stubblefield, and Long.

Fourth, plaintiff contends that MODOC, Welke, and Mitchell violated his constitutional rights by punishing him when he was a pretrial detainee.

Fifth, plaintiff asserts that MODOC's policies regarding nepotism led to him being subjected to "unfettered abuses, reprisals, etc."

Sixth, plaintiff states that MODOC, Lawton, Arflack, Sanni, Martin, Quainoo, Precythe, and Lamb denied him the right to prove his innocence during disciplinary hearings.  Doc. 7 at p. 35.

Seventh, regarding conduct violations, plaintiff alleges that his constitutional rights were violated by Staci Smith, Terri Paige, MODOC, Daniels, and Long "by exceeding the 7 day statute of limitations and finding him guilty in clear absence of all jurisdiction."

Eighth, plaintiff accuses defendants MODOC, Sergeant Warren, COI Warren, Sancegraw, Groose, Sergeant Browers, Gilliam, Best, Kelley, White, Paige, Staci Smith, McGinley, and Lombardi of violating his rights by confiscating, destroying, losing, or breaking his property while it was in their care and control.

As a result, plaintiff seeks unspecified injunctive relief, compensatory damages of $50,000 per defendant and one dollar a day for the sixty days he spent sleeping on the floor in administrative segregation at the MECC, and punitive damages of $150,000 per defendant, along with $1,000 a day for every day he slept on the floor in administrative segregation at the MECC. Doc. 7 at pp. 36, 38.

Attached to the amended complaint are thirty-three pages of exhibits, including court orders, conduct violation reports, a J-Pay letter, informal resolution requests, grievances, grievance appeals, grievance appeal responses, warden responses, invoices, affidavits, and letters.  The Court treats these attachments as part of the pleadings.  *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); *see also Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (stating that "while ordinarily, only the facts alleged in the complaint are considered in determining whether it states a claim, materials attached to the complaint as exhibits may be considered in construing the

sufficiency of the complaint"); *Pratt v. Corr. Corp. of Am.*, 124 F. App'x 465, 466 (8th Cir. 2005) (explaining that "the district court was required to consider the allegations not only in [plaintiff's] pro se complaint, but also in his motion to amend, his response to defendants' motion to dismiss, and the attachments to those pleadings").

### Legal Standard on Initial Review

Under 28 U.S.C. § 1915A, the Court is required to review a civil complaint "in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a).  The term "prisoner" is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law." 28 U.S.C. § 1915A(c).  Pursuant to this section, the Court must dismiss a complaint if it "is frivolous, malicious, or fails to state a claim upon which relief can be granted," or if it "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).  Here, plaintiff is a convicted state prisoner who is suing employees of a governmental entity.  Therefore, his amended complaint is subject to 28 U.S.C. § 1915A screening.

To state a claim, a plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id*. at 679. The court must "accept as true the facts alleged, but not legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Barton v. Taber*,

17

820 F.3d 958, 964 (8th Cir. 2016); *see also Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 372–73 (8th Cir. 2016) (stating that court must accept factual allegations in complaint as true, but is not required to "accept as true any legal conclusion couched as a factual allegation").

When reviewing a pro se complaint under 28 U.S.C. § 1915(e)(2), the Court must give it the benefit of a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015).  However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980); *see also Stone v. Harry*, 364 F.3d 912, 914–15 (8th Cir. 2004) (stating that federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint").  In addition, affording a pro se complaint the benefit of a liberal construction does not mean that procedural rules in ordinary civil litigation must be interpreted so as to excuse mistakes by those who proceed without counsel. *See McNeil v. United States*, 508 U.S. 106, 113 (1993).

### Discussion

Plaintiff is a self-represented litigant who brings this civil action pursuant to 42 U.S.C. § 1983,  alleging numerous constitutional violations against eighty-six separate defendants over the course of more than thirty years.[3]  Because he is a prisoner suing state employees, the Court has reviewed his amended complaint under 28 U.S.C. § 1915A.  Based on that review, and for the reasons discussed below, the Court dismisses this action with prejudice.

---

[3] Plaintiff's earliest claim arises on November 12, 1988. Plaintiff signed his original complaint on April 29, 2021, approximately thirty-two years and five months later.

I.      **Res Judicata**

Plaintiff's amended complaint is barred by res judicata.  The doctrine of res judicata, which encompasses the concepts of both claim preclusion and issue preclusion, has been applied to dismiss the complaints of plaintiffs proceeding in forma pauperis under 28 U.S.C. § 1915.  *See Pointer v. Parents for Fair Share*, 87 F. App'x 12 (8th Cir. 2004) (affirming district court dismissal under 28 U.S.C. § 1915(e)(2)(B) on the basis of res judicata); *Henderson v. Engstrom*, No. CIV 14-4116, 2014 WL 4678262, at *2 (D.S.D. Sept. 18, 2014) (stating that "[w]here res judicata applies to an IFP plaintiff's complaint, courts have dismissed the complaint under § 1915(e)(2)(B) for failure to state a claim or for being frivolous").  Likewise, res judicata has been applied to cases reviewed under 28 U.S.C. § 1915A.  *See Skipper v. Jefferson City Corr. Ctr.*, No. 09-4004-CV-C-SOW, 2009 WL 2044657, at *1 (W.D. Mo. July 10, 2009) (dismissing amended complaint on res judicata grounds, pursuant to 28 U.S.C. § 1915A); *Gross v. Hutchinson*, No. 19CV00933, 2020 WL 4557938, at *1 (E.D. Ark. Jan. 16, 2020), *report and recommendation adopted,* No. 19CV00933, 2020 WL 4555721 (E.D. Ark. Aug. 6, 2020) (determining that complaint should be dismissed under 28 U.S.C. § 1915A "as barred by res judicata").

Res judicata has also been applied to complaints brought in federal court pursuant to 42 U.S.C. § 1983 after those complaints were previously litigated in state court.  *See Kruger v. Erickson*, 77 F.3d 1071, 1074 (8th Cir. 1996) (explaining that "the doctrines of issue and claim preclusion, as well as 28 U.S.C. § 1738, apply to the issues in a § 1983 case which have been fully litigated in the state court" (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82–83 (1984))).  In determining whether res judicata applies, the Court looks to state preclusion law.  *See Stephens v. Jessup*, 793 F.3d 941, 944 (8th Cir. 2015) (stating that "[u]nder

the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give the same preclusive

effect to state court judgments that those judgments would be given in the courts of the State

from which the judgments emerged").

### A.    Missouri preclusion law

In Missouri, where plaintiff's earlier case was decided, the "doctrine of res judicata

precludes relitigation of a claim formerly made." *Chesterfield Vill., Inc. v. City of Chesterfield*,

64 S.W.3d 315, 318 (Mo. 2002).  Res judicata "applies not only to points and issues upon which

the court was required by the pleadings and proof to form an opinion and pronounce judgment,

but to every point properly belonging to the subject matter of litigation and which the parties,

exercising reasonable diligence, might have brought forward at the time." *King Gen.*

*Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495,

501 (Mo. 1991).  Res judicata is also known as claim preclusion.  *Olofson v. Olofson*, 625

S.W.3d 419, 427 (Mo. 2021).

For res judicata to apply, "four identities must occur: 1) identity of the thing sued for; 2)

identity of the cause of action; 3) identity of the persons and parties to the action; and 4) identity

of the quality of the person for or against whom the claim is made." *King General Contractors,*

*Inc.*, 821 S.W.2d at 501.  "To determine whether a claim is barred by a former judgment, the

question is whether the claim arises out of the same act, contract, or transaction." *Chesterfield*

*Village, Inc.*, 64 S.W.3d at 318–19.  In other words, as "long as the underlying facts are the

same, res judicata bars re-litigation of the matter whether upon the same or different cause of

action, claim, demand, ground or theory." *Roy v. MBW Constr., Inc.*, 489 S.W.3d 299, 305 (Mo.

Ct. App. 2016).

B.      Plaintiff's earlier state court action

Before filing the instant action, plaintiff filed a similar—and in many respects,

identical—case in Missouri state court.  *See Clark v. Missouri Department of Corrections, et al.*,

No. 21SL-CC02269 (21st Jud. Cir., St. Louis County).[4]  All the defendants named in the

amended complaint in this Court were named in the prior action, with the exception of COI

Lamb.  The allegations there, as here, spanned thirty years, occurred at nine different correctional

institutions, and encompassed claims regarding grievances, access to the courts, mail, lost or

damaged property, unconstitutional conditions of confinement, false conduct violations,

unconstitutional disciplinary hearings, a failure to protect him from other inmates, denial of visits

from his fiancé, speedy trial violations, excessive force, and sexual assault.[5]

Plaintiff's state court complaint is thirty-one pages long, which is shorter than the present

amended complaint.  Some of that difference is due to the fact that plaintiff attached a

typewritten complaint to the Court's prisoner civil rights complaint form.  The Court observes,

however, that there are some additional allegations in the amended complaint that do not appear

in the earlier state complaint.  Specifically, the allegations in the state complaint spanned

paragraphs sixty-five to ninety-four, while the allegations in the amended complaint stretch from

paragraphs sixty-five to ninety-seven.  The three additional paragraphs concern defendants

Welke and Mitchell revoking his parole; defendant Sanni giving his mail to the wrong inmate;

and COI Lamb being handed plaintiff's federal complaint for mailing.  Defendants Welke,

---

[4] Plaintiff's state court case was reviewed on Case.net, Missouri's online case management system.  The Court takes judicial notice of this public record.  *See Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) (explaining that district courts may take judicial notice of public state records); *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (stating that courts "may take judicial notice of judicial opinions and public records").
[5] In its order of dismissal, the circuit court references eighty-one defendants, but review of the actual complaint shows that plaintiff identifies eighty-five separate individuals, with COI Lamb being the only defendant added to the amended complaint in this Court.  The Court also notes that the circuit court references eight correctional institutions, but appears to forget to count the ERDCC.

Mitchell, and Sanni were all identified as defendants in state court, but Welke and Mitchell had

no factual allegations asserted against them, while Sanni was targeted with fewer allegations.  As

already noted, COI Lamb did not appear at all in the state complaint.

Plaintiff has also made some changes to his "causes of action."  Both his state complaint

and amended complaint contain eight separate causes of action, but the amended complaint has

been slightly reworded.  The first cause of action in both complaints relates to the right to

petition for grievances and to access the courts.  In the amended complaint, however, plaintiff

has added the names of the defendants he apparently believes responsible.

With regard to the second cause of action, the state complaint asserts a violation of

plaintiff's speedy trial rights, while the amended complaint accuses MODOC of unlawfully

releasing him into county custody for transportation to criminal court, thereby "infringing on his

right to a fast and speedy trial."

As to the third cause of action, both the state complaint and the federal amended

complaint assert a reprisal and retaliation claim.  The only difference is that in the amended

complaint, plaintiff has added the names of individual defendants.

Concerning the fourth cause of action, despite slightly different wording, both the state

complaint and amended complaint assert that plaintiff was unconstitutionally punished as a

pretrial detainee.  Likewise, the fifth cause of action in both the state complaint and federal

amended complaint focus on plaintiff's contention that MODOC has unconstitutional nepotism

policies.

Regarding the sixth cause of action, there is different wording between the state

complaint and amended complaint, but both allege that plaintiff was denied his right to produce

documentary evidence during disciplinary hearings.  Similarly, in the seventh cause of action in

22

both the state and federal complaint, plaintiff contends that his due process rights were violated when he was punished following disciplinary hearings held beyond "the 7 day statute of limitations."

Finally, in the eighth cause of action in both the state complaint and federal amended complaint, plaintiff asserts the violation of his rights due to the loss, damage, or destruction of his property.  The chief difference between the two pleadings is that in the amended complaint, plaintiff appends the name of individual defendants.

For the most part, however, the state complaint and the federal amended complaint are the same.  Indeed, they are mostly indistinguishable as to substance, and much of the amended complaint appears to be a copy of the state complaint, including identical phrasings, errors, and even smudges.

The state circuit court received plaintiff's complaint on April 30, 2021.  The circuit court reviewed the case under the Missouri Prisoner Litigation Reform Act.  Based on that review, the circuit court dismissed plaintiff's complaint with prejudice on December 14, 2021.  Plaintiff did not appeal.

### C.    Application of res judicata

As noted above, in Missouri, res judicata requires four identities: "1) identity of the thing sued for; 2) identity of the cause of action; 3) identity of the persons and parties to the action; and 4) identity of the quality of the person for or against whom the claim is made."  *King General Contractors, Inc.*, 821 S.W.2d at 501.  Those four identities are present between plaintiff's earlier state complaint and the instant action.

With regard to the first two identities, "the thing sued for" and "the cause of action," these two identities are defined as "the facts that form or could form the basis of the previous

adjudication." *Kesler v. Curators of the Univ. of Mo.*, 516 S.W.3d 884, 890–91 (Mo. Ct. App. 2017).  "The facts that form the basis of the previous adjudication are the same and, therefore, the identities of the thing sued for and the cause of action are the same, if the claim arises out of the same act, contract or transaction as the previous adjudication." *Id*. at 891.

Here, "the facts that form or could form the basis of the previous adjudication" are almost exactly the same.  Both the state complaint and the amended complaint arise from plaintiff's thirty-plus years of incarceration at nine different prisons, encompassing claims regarding grievances, access to the courts, mail, lost or damaged property, unconstitutional conditions of confinement, false conduct violations, unconstitutional disciplinary hearings, a failure to protect him from other inmates, denial of visits from his fiancé, speedy trial violations, excessive force, and sexual assault.  Aside from the addition of three paragraphs in the amended complaint, the factual allegations are nearly identical.  More to the point, major portions of the amended complaint appear to have come from the complaint previously filed in state court.  Therefore, the first two identities are present.

As to the third identity, a "party is identical, for purposes of res judicata, when it is the same party that litigated the prior suit or when the new party was in privity with the party that litigated the prior suit." *Suppes v. Curators of the Univ. of Mo.*, 613 S.W.3d 836, 849 (Mo. Ct. App. 2020).  Here, plaintiff is the same person who filed both the first complaint in state court and the subsequent amended complaint in this Court.  Therefore, the third identity is present.

Regarding the fourth identity of res judicata, the "identity of the quality or status of the person for or against whom the claim is made," a court looks "not only to the caption of the prior litigation, but also to the substance of the petition in the prior litigation." *Lauber-Clayton, LLC v. Novus Props. Co.*, 407 S.W.3d 612, 619 (Mo. Ct. App. 2013).  "The phrase quality of the

person apparently refers to the status in which he sues or is sued." *Fleming v. Mercantile Bank & Tr. Co.*, 796 S.W.2d 931, 935 (Mo. Ct. App. 1990). However, while the designation of the defendants might be different in each case, "the scope of res judicata transcends such nominal difference where the subject matters of both disputes are essentially the same." *Mullen v. Roberts & Roberts Real Est., Inc.*, 550 S.W.2d 588, 589 (Mo. Ct. App. 1977). "Where a party in an individual or representative capacity is asserting or protecting the same rights or interests he later seeks to assert or protect in a different representative capacity, he is in effect the same party, or at least in one capacity he is in privity with his other capacity." *Smith v. Preis*, 396 S.W.2d 636, 640 (Mo. 1965).

In this case, eighty-five of the defendants individually identified in the amended complaint are also named as defendants in the prior state court action. Further, all the defendants in both cases are named in both their official and individual capacities. Plaintiff added one additional defendant to the amended complaint that was not in the state action; however, that defendant, COI Lamb, is not alleged to have committed a constitutional violation, as his only role in the case was to receive a complaint for mailing. Thus, the substance of both the prior litigation and the instant case remain the same. Because the defendants in both cases are almost entirely identical, and sued in the same capacities, the Court concludes that the fourth identity exists as well.

Res judicata operates to prevent relitigation of a previously adjudicated claim in a subsequently filed action. *See Steinbach*, 637 S.W.3d at 501. As discussed above, plaintiff filed a nearly identical prior action in state court on April 30, 2021. The circuit court dismissed the case with prejudice on December 14, 2021, and plaintiff did not file an appeal. Instead, plaintiff initiated an action in this Court, submitting an amended complaint the Court received on

February 7, 2022.  For the reasons discussed above, plaintiff is precluded from relitigating claims that were previously decided on the merits.  The Court dismisses plaintiff's complaint with prejudice for this reason.

## II.   Statute of limitations

Even if this case were not subject to dismissal on the basis of res judicata, the Court notes that the vast majority of plaintiff's claims are clearly barred by the statute of limitations.  While there is no statute of limitations contained within 42 U.S.C. § 1983 itself, the Supreme Court "has held that § 1983 claims accruing within a particular state should be governed by that state's statute of limitations governing personal-injury claims."  *Walker v. Barrett*, 650 F.3d 1198, 1205 (8th Cir. 2011).  Thus, for cases arising in Missouri, the five-year statute of limitations for personal injury actions found in Mo. Rev. Stat. § 516.120(4) applies to § 1983 actions.  *Sulik v. Taney County*, 393 F.3d 765, 767 (8th Cir. 2005).  In Missouri, the statute of limitations for personal injury actions begins when the damage is capable of becoming known, not when the injury is actually discovered.  *See Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 580 (Mo. 2006), *as modified on denial of reh'g* (Aug. 22, 2006); *Chemical Workers Basic Union, Local No. 1744 v. Arnold Sav. Bank*, 411 S.W.2d 159, 163–64 (Mo. 1966).

While the statute of limitations is an affirmative defense, a district court may properly dismiss an in forma pauperis complaint under 28 U.S.C. § 1915 when it is apparent the statute of limitations has expired.  *Myers v. Vogal*, 960 F.2d 750, 751 (8th Cir. 1992); *see also Morris v. Hewitt*, No. 20-CV-05175, 2020 WL 6140451, at *2 (W.D. Ark. Oct. 19, 2020) (dismissing case pursuant to 28 U.S.C. § 1915A as barred by the statute of limitations).

Here, plaintiff signed his original complaint on April 29, 2021.  Doc. 1 at p. 32. Missouri's five year statute of limitations would thus encompass claims occurring within the five

previous years.  In this case, that means that only claims arising on or after April 29, 2016 are timely.  Plaintiff's own allegations demonstrate that most of his claims were capable of being known far before that.  Specifically, plaintiff's "Statement of the Facts" consists of fifty-one separate paragraphs and subparagraphs, numbered 65 through 97.  Of those fifty-one paragraphs and subparagraphs, forty contain claims that are clearly time-barred.[6]  In other words, plaintiff has clearly indicated in those forty claims that the incident occurred—and the damage was capable of being known—before April 29, 2016, putting the claims outside the five-year limitations period.

## III.   Non time-barred claims

There are eleven paragraphs or subparagraphs in plaintiff's "Statement of the Facts" that are either not time-barred or do not contain a date.  One of these paragraphs consists only of the allegation that all defendants acted under color of state law.  Doc. 7 at p. 30, ¶ 94.  Of the remaining ten claims, six are against the Missouri Department of Corrections, and four are directed against individual defendants.

---

[6] Those claims—and the corresponding dates—are as follows: (1) ¶ 65, June 13, 1990; (2) ¶ 66, January to August 1990; (3) ¶ 67(b), August 14, 1990 and September 5, 1990; (4) ¶ 67(c), August 1990 and September 1990; (5) ¶ 68, August 14, 1990 to September 5, 1990; (6) ¶ 69, August 10, 1992; (7) ¶ 70, February 27, 1998; (8) ¶ 71, 1998; (9) ¶ 72, February 1998 to May 1998; (10) ¶ 73, October 18, 2003, August 19, 2003, and April 29, 2004; (11) ¶ 74, November 20, 2014 and December 4, 2014; (12) ¶ 75, February 29, 2015; (13) ¶ 76, August 19, 2003 to August 4, 2005, November 9, 2004, and February 15, 2006; (14) ¶ 77, November 16, 2004; (15) ¶ 78, June 10, 1994; (16) ¶ 79, January 1, 2004; (17) ¶ 80, December 1999; (18) ¶ 81, between 2001 and 2002; (19) ¶ 82, between August 2003 and August 2005; (20) ¶ 83(a), February 28, 2000; (21) ¶ 83(b), May 12, 2000; (22) ¶ 83(c), April 4, 2006; (23) ¶ 84(d), October 16, 2006 and November 2, 2006; (24) ¶ 83(e), July 27, 2005; (25) ¶ 83(f), July 28, 2004; (26) ¶ 83(g), November 12, 2014; (27) ¶ 83(h), August 25, 2010; (28) ¶ 85, December 28, 2005 and August 30, 2006; (29) ¶ 86, early 2014, February 3, 2015; (30) ¶ 87, June 7, 1994 and January 1995; (31) ¶ 87(b), April 15, 2015; (32) ¶ 88, May 15, 1998 and November 15, 1998; (33) ¶ 88(a), August 24, 1999 and April 26, 2000; (34) ¶ 88(b), June 28, 1989 and August 6, 1990; (35) ¶ 89, June 2014 to September 2014, and September 4, 2014; (36) ¶ 90, September 5, 2014, September 16, 2014, September 19, 2014, December 4, 2014, January 14, 2015, March 18, 2015, April 2, 2015, and June 2009; (37) ¶ 91, May 12, 2004 to July 2004; (38) ¶ 92, June 11, 2003 and July 2, 2003; (39) ¶ 94(c), April 30, 2015 and June 3, 2015; and (40) ¶ 95, December 12, 1988 and May 17, 1989.

A.      **Claims against MODOC**

As noted above, plaintiff has made six claims against MODOC that do not include a date, meaning the Court cannot precisely determine whether they are time-barred.  In particular, plaintiff alleges that:  MODOC deprived him of an adequate postconviction remedy; that MODOC lost his medical paperwork; that MODOC deprived him of an adequate postconviction remedy by not providing enough typewriters, causing him to be unable to file a timely Rule 29.15 motion; that MODOC violated his right to petition for grievances and to access the courts; that MODOC has an unconstitutional policy regarding nepotism; and that MODOC has an unconstitutional grievance policy.  Doc. 7 at p. 14, ¶ 67, ¶ 67(a), and ¶ 67(d); Doc. 7 at p. 22, ¶ 83; Doc. 7 at p. 30, ¶ 93 and ¶ 94(b).

Regardless of their timeliness, these claims are subject to dismissal based on the doctrine of sovereign immunity.  "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011).  The Eleventh Amendment has been held to confer sovereign immunity on an un-consenting state from lawsuits brought in federal court by a state's own citizens or the citizens of another state. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *see also Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018) (stating that "[t]he Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court"); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618–19 (8th Cir. 1995) (stating that "[g]enerally, in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment").  The Eleventh Amendment bars suit against a state or its agencies for any kind of relief, not merely monetary damages.  *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594

(8th Cir. 2007) (finding the district court erred in allowing plaintiff to proceed against state

university for injunctive relief, and remanding matter to district court for dismissal).

There are two "well-established exceptions" to the sovereign immunity provided by the

Eleventh Amendment. *Barnes v. Missouri*, 960 F.2d 63, 64 (8th Cir. 1992). "The first exception

to Eleventh Amendment immunity is where Congress has statutorily abrogated such immunity

by clear and unmistakable language." *Id*. The second exception is when a state waives its

immunity to suit in federal court. *Id*. at 65. A state will be found to have waived its immunity

"only where stated by the most express language or by such overwhelming implications from the

text as will leave no room for any other reasonable construction." *Welch v. Tex. Dep't of

Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987). Neither exception is applicable in this

case.

The first section is inapplicable because 42 U.S.C. § 1983—under which this case

arises—does not revoke a state's Eleventh Amendment immunity from suit in federal court. *See

Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) (stating that "[w]e cannot conclude

that § 1983 was intended to disregard the well-established immunity of a State from being sued

without its consent"); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) (stating that "we simply are

unwilling to believe . . . that Congress intended by the general language of § 1983 to override the

traditional sovereign immunity of the States").

The second exception is also inapplicable, because the State of Missouri has not waived

its immunity in this type of case. *See* Mo. Rev. Stat. § 537.600 (explaining that sovereign

immunity is "in effect," and providing exceptions relating to the "negligent acts or omissions by

public employees arising out of the operation of motor vehicles . . . within the course of their

employment," and regarding "[i]njuries caused by the condition of a public entity's property").

Here, MODOC is a department of the State of Missouri. As such, any claim against it is barred by the sovereign immunity provided by the Eleventh Amendment.  This immunity protects a state from suit for any type of relief, be it monetary or injunctive.  Furthermore, plaintiff has not demonstrated that any exceptions to sovereign immunity are present in this case. Therefore, to the extent that plaintiff's claims against MODOC are not untimely, they are barred by sovereign immunity.

**B.**   **Official-capacity claims against Defendants Quainoo, Sanni, Martin, Ramey, Precythe, Bales, and Lamb**

Plaintiff has made four claims that do not appear to be time-barred, as they occurred after April 29, 2016.  The defendants implicated by these claims are Isaac Quainoo, Julius Sanni, Assistant Warden Raina Martin, Warden Eileen Ramey, Director Anne Precythe, Joyce Bales, and COI Lamb.  Plaintiff has sued these defendants in their official capacities.

In an official capacity claim against an individual, the claim is actually "against the governmental entity itself."  *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017).  Thus, a "suit against a public employee in his or her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999); *see also Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018) (explaining that official capacity suit against sheriff and his deputy "must be treated as a suit against the County"); *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016) (stating that a "plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer"); *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (stating that a "suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent").

Here, each of these defendants is alleged to be employed by the State of Missouri.  As such, the official capacity claims against them are claims against the state itself.  These claims fail for two reasons.

First, 42 U.S.C. § 1983 "provides for an action against a 'person' for a violation, under color of law, of another's civil rights."  *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008); *see also Deretich v. Off. of Admin. Hearings*, 798 F.2d 1147, 1154 (8th Cir. 1986) ("Section 1983 provides a cause of action against 'person[s]' only").  However, "neither a State nor its officials acting in their official capacity are 'persons' under § 1983."  *Will*, 491 U.S. at 71; *see also Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (explaining that a "State is not a person under § 1983"); *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (explaining that "a state is not a person for purposes of a claim for money damages under § 1983").

In this case, plaintiff is suing for money damages.[7]  The State of Missouri is not a 42 U.S.C. § 1983 "person" for the purposes of such claims.  As he is missing an essential element of a § 1983 action, the official capacity claims must be dismissed.

Second, as explained above, sovereign immunity prevents plaintiff from suing the State of Missouri.  *See Webb*, 889 F.3d at 485 (stating that "[t]he Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court").  The protection of the Eleventh Amendment extends to claims for money damages against state officials in their official capacities.  *See Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) (stating that "[a] claim for damages against a state employee in his official capacity is barred under the

---

[7] The Court notes that in his request for relief, plaintiff seeks unspecified injunctive relief. Plaintiff has not stated what he wants enjoined, and he certainly provides no indication that he is seeking an injunction against these specific defendants. The Court further notes that even if plaintiff was seeking prospective injunctive relief, he has not alleged that these particular defendants carried out any official policy or custom attributable to MODOC or the State of Missouri.

Eleventh Amendment").  As plaintiff is seeking money damages, his official capacity claims are barred by sovereign immunity.

### C.      Individual-capacity claims against Defendants Quainoo, Sanni, Martin, Ramey, Precythe, Bales, and Lamb

Individual liability in a 42 U.S.C. § 1983 case is personal.  *Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017).  In other words, "[g]overnment officials are personally liable only for their own misconduct."  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).  As such, § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (quoting *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)).  *See also Kohl v. Casson*, 5 F.3d 1141, 1149 (8th Cir. 1993) (dismissing plaintiff's excessive bail claims because none of the defendants set plaintiff's bail, and therefore, "there can be no causal connection between any action on the part of the defendants and any alleged deprivation" of plaintiff's rights).  To that end, a plaintiff must allege facts connecting the defendant to the challenged action.  *See Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019).

Here, as laid out below, plaintiff has asserted a number of claims against Quainoo, Sanni, Martin, Ramey, Precythe, Bales, and Lamb relating to his mail and his access to his property. None of the claims demonstrate the violation of one of his constitutional rights.

First, plaintiff alleges that on September 24, 2020, he received a copy of his *St. Louis American* newspaper from Isaac Quainoo, which was dated August 27, 2020.  Doc. 7 at p. 19, ¶ 84.  According to plaintiff, this delay of "thirty days" constitutes harassment, which he complains has been going on "for too many years now."

This allegation does not state a constitutional violation.  There is no factual support for the proposition that a onetime delay in receiving a newspaper violates plaintiff's rights in and of

itself.  Furthermore, there is no indication that this delay implicated other rights.  For example, plaintiff does not allege that he was delayed in receiving religious or privileged legal materials. The Court also notes that there are no facts showing that Isaac Quainoo intentionally held onto the newspaper for thirty days before delivering it.  That is, lacking any facts showing intent or responsibility, it is just as likely that plaintiff's delayed mail arose from reasons not attributable to Quainoo; likewise, plaintiff's allegation that the "harassment" has been going on "for too many years now[]" lacks any factual support.  Without more, plaintiff's unsupported conclusion is not entitled to the presumption of truth. *See Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019) (explaining that a court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts").  Therefore, plaintiff has failed to state an individual capacity claim against Quainoo.

Second, plaintiff asserts that on August 25, 2020, he received a J-Pay email communication telling him he had a new password. Doc. 7 at p. 19, ¶ 84. However, he insists that he never had a J-Pay account, and this email proves his "vital information had been compromised."  Plaintiff blames Assistant Warden Martin, Warden Ramey, and Director Precythe for this "fraud" and "vital information compromise."

Here, plaintiff's allegation that receiving a new-password email is undeniable proof of fraud or the "compromise" of his "vital information" is entirely unsupported by any facts.  It certainly does not indicate the violation of a constitutional right.  More to the point, however, there are no facts directed at Martin, Ramey, or Precythe demonstrating that they did—or failed to do—anything to harm him.  Plaintiff's contention that these defendants do not seem "to even care" is not sufficient to establish a causal link between them and a constitutional violation.

Therefore, plaintiff has failed to state individual capacity claims against Martin, Ramey, or Precythe.

Third, plaintiff states that on April 24, 2018, Joyce Bales "refused to allow [him] into the property room to inspect/exchange his legal property," advising him he was not on the list. Doc. 7 at p. 31, ¶ 94(d). Plaintiff argues that his "name and number were on" the list because "he saw it in her hand." He vaguely adds that "the exact same thing played out again" on May 18, 2018 and October 2, 2018. However, in an exhibit plaintiff has attached to the amended complaint, the warden notes that plaintiff's "name did not appear on the pass list for the Property Room on April 24, 2018," but that a pass would be sent to him so that he could look over his legal documents. Doc. 7-1 at p. 19.

Here, plaintiff directly alleges that defendant Bales kept him from going to the property room on a single occasion. He has presented conflicting allegations as to whether his name was actually on the pass list to view his property. In any event, plaintiff has not demonstrated that Bales's actions on April 24, 2018 deprived him of his constitutional rights. That is, he has not shown that his inability to view or exchange his legal material on that day kept him from accessing the courts. To make such a showing, plaintiff must allege that he was frustrated or impeded in making a nonfrivolous legal claim. *See White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007). None of his broad and conclusory allegations touch on this issue. Therefore, plaintiff has failed to state an individual capacity claim against Bales.

Fourth, plaintiff states that on April 30, 2021, Julius Sanni "gave his mail to the wrong inmate on purpose," which he claims to know because he "was looking right at [Sanni] as it happen[ed]." Doc. 7 at p. 32, ¶ 96. Then, on May 5, 2021, Sanni gave plaintiff another inmate's

mail, purportedly "in an attempt to add insult to injury."  Plaintiff then adds—without elaboration—that one of his relatives once "had a suspicious fire" after "this type of mail fraud."

With regard to this allegation, plaintiff has not shown that this single instance of Sanni giving his mail to the wrong person violated his constitutional rights.  He presents no facts, aside from his unsupported declaration, to show that Sanni did this intentionally.  To the contrary, based on his own allegations, this appears to be a mistake.  Furthermore, he has not alleged that the mail was in any way privileged, and that his inability to receive it harmed him.  The suggestion that Sanni somehow committed mail fraud, or that this incident was related to a fire at the address of one of plaintiff's relatives, lacks factual support and is as frivolous as it is fanciful.  Therefore, the individual-capacity claim against Sanni must be dismissed.

Finally, plaintiff asserts that on April 29, 2021, he "mailed out this very complaint."  Doc. 7 at p. 33, ¶ 97.  Because it was "too large to fit into the mail box slot," he "handed it over to defendant COI Lamb thru [sic] the bubble portal."  Then, confusingly, plaintiff states that "he disappeared legal mail again—making sure that COI defendant Quainoo wound up with it/and passed it out to the wrong inmate."

It is unclear, exactly, what plaintiff is alleging COI Lamb did or did not do.  Other than receive plaintiff's complaint for mailing, there are no further facts detailing his actions.  Certainly, plaintiff does not contend that his federal complaint was not mailed, or that this Court did not receive it.  To state a claim, plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level."  *See Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017).  Here, he has not done this.  Instead, his vague allegations require speculation, as well as the acceptance of unsupported conclusions and inferences, which is not sufficient.  *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) (stating that "[w]hile the court must

accept allegations of fact as true . . . the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations").  Therefore, the individual capacity claim against COI Lamb must be dismissed.

For all the reasons discussed above, even if plaintiff's individual capacity claims against Isaac Quainoo, Julius Sanni, Assistant Warden Raina Martin, Warden Eileen Ramey, Director Anne Precythe, Joyce Bales, and COI Lamb were not barred by res judicata, the Court dismisses these individual capacity claims for failure to state a claim..

## IV.    Conspiracy under 42 U.S.C. § 1985

Aside from his 42 U.S.C. § 1983 claims, plaintiff purports to bring his amended complaint under 42 U.S.C. § 1985, alleging a widespread conspiracy against him.  To establish a civil conspiracy under § 1985, a plaintiff must demonstrate "(1) that the defendants conspired, (2) with the intent to deprive him of equal protection of the laws, or equal privileges and immunities under the laws, (3) that one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy, and (4) that he was injured or deprived of having and exercising any right or privilege of a citizen of the United States."  *Mendoza v. U.S. Immigr. & Customs Enf't*, 849 F.3d 408, 421 (8th Cir. 2017).

The first element requires the plaintiff to "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement."  *Johnson v. Perdue*, 862 F.3d 712, 717–18 (8th Cir. 2017); *see also Crutcher-Sanchez v. County of Dakota*, 687 F.3d 979, 987 (8th Cir. 2012) (stating that "[a] conspiracy claim requires evidence of specific facts that show a meeting of the minds among conspirators").  Conjecture and speculation are insufficient to prove the existence of a conspiracy.  *Mettler v. Whitledge*, 165 F.3d 1197, 1206

(8th Cir. 1999).  Further, unless a constitutional violation occurs, there is no actionable conspiracy claim.  *Robbins v. Becker*, 794 F.3d 988, 997 (8th Cir. 2015).

In this case, plaintiff has not properly alleged that defendants reached an agreement among themselves to violate his constitutional rights.  Indeed, the notion stretches the bounds of credulity.  Plaintiff's amended complaint spans thirty years, nine prisons, and eighty-six defendants.  At no point in his lengthy pleadings does he make any attempt to factually demonstrate that any of these eighty-six men and women reached an agreement among themselves to deprive him of his rights under the constitution.  Plaintiff's repeated assertions that a conspiracy existed is—like much else in his amended complaint—an unsupported conclusion that is insufficient to state a claim.  *See Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (stating that "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do").  Therefore, to the extent that plaintiff is suing under 42 U.S.C. § 1985, such claim must be dismissed.

## V.    Summary dismissal

Under 28 U.S.C. § 1915A, the Court must dismiss a complaint filed by a prisoner if it "is frivolous, malicious, or fails to state a claim upon which relief can be granted," or if it "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).

Here, plaintiff has filed an amended complaint that appears to be an attempt to encompass every perceived wrong he has experienced in over thirty years of incarceration.  However, as discussed above, before submitting his amended complaint, he filed a similar—and in many respects identical—action in state court.  The state court dismissed his prior complaint with prejudice, meaning that the instant action is barred by the doctrine of res judicata.

Even if res judicata did not apply, forty of plaintiff's claims are time-barred, because they occurred outside his five-year limitations period.  Indeed, his earliest claim is thirty-two years and five months old.  As to the balance of his claims, most of them are directed at MODOC, which is protected from suit by the Eleventh Amendment.  With regard to the non-time-barred claims against individual defendants, plaintiff has failed to demonstrate each defendant's responsibility for violating his constitutional rights.  He has also failed to adequately allege the existence of a conspiracy under 42 U.S.C. § 1985.  For all these reasons, the Court dismisses this action with prejudice.

## VI.    Conclusion

Accordingly, the Court orders that plaintiff's motions for appointment of counsel, Docs. 8 and 10, are denied as moot.  The Court further orders that this action is dismissed with prejudice.  *See* 28 U.S.C. § 1915A.  The Court certifies that an appeal would not be taken in good faith.  *See* 28 U.S.C. § 1915(a)(3).  A separate order of dismissal accompanies this memorandum and order.

Dated this 26th day of May 2022.

STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE